In Re Villena In Re Villena In Re Villena Under the Administrative Procedures Act, there are three separate grounds on which to set aside this decision. And the first grounds, of course, is we contend that the decisions made by the Patent Office are not in accordance with law. Second, there's no substantial evidence. And third, the Patent Office prejudice the client, as is outlined in my briefs. You don't even have to get to the evidentiary issue. I know evidence is a little hot topic right now. But if you turn to, let's say, Appendix 113 to 116, you'll find the examiner's initial rejection. It consists of ignoring the boilerplate and the header of less than 470 words of Ipsodixit statements. No evidence. But most important, under Step 1 of the Alice Mayo test, he did not accurately describe the claims under Step 1. And under Step 2, the examiner failed to address various specific steps and also didn't address the steps as an ordered combination. This alone is enough to set aside. This alone fails to meet a prima facie case of patent ineligible eligibility under the MPEP 2106 Roman numeral III. That said, the Board did nothing more than affirm the examiner, even though the examiner and the Board also failed to address the claims as a whole and failed to address certain claims, including the portion about preprocessing claims, putting AVM values in a database, keeping current AVM values in a database. Never addressed, and that alone, there's a failure, and this opinion should be set aside. I just want to have one factual question. Sure. My understanding from reading the patent is that the AVM valuation itself, that's not something that was novel or new, right? No, it's not novel or new. I contend it's not abstract, but no, it's not novel or new. Now, that being said, Your Honor, when it comes to the evidentiary issue, and here I know is the hot topic, is that starting from the Alice Mayo, Alice Mayo, the Supreme Court always intended this to be a factually intensive analysis. Mayo, for example, it was a natural phenomenon, but the extra steps were admitted as being well-known, routine, and conventional in the specification of the patent. And I think on a slip of opinion, it's going to be pages 9 or 10 on a slip of opinion. And on the slip of opinion of Alice, I think it's also about 10 or 11, you'll find that the Supreme Court, to make its assertion that the business method at issue was well-known, routine, and conventional, cited a number of textbooks, some going back to 1896. So in this case, the Supreme Court acknowledges that evidence is necessary. And going to some of the more recent decisions, some of which you took part in, Judge Stahl, Berkheimer, Atrix, and acknowledged that evidence is an issue to establish that something really is well-known, routine, and conventional. So in this case, I'm just for a minute taking your view that there's factual issues here. Wouldn't those things be reviewed for substantial evidence? Pardon? If there were any factual disputes in this case, under Step 2 of Alice, they would be reviewed for substantial evidence on appeal from the PDTAB, right? I'm sorry, again? They would be reviewed for substantial evidence on appeal from the PDTAB? Well, the PDTAB never did. I mean, there was nothing from the… Well, I'm just talking about the standard of review that this Court, hypothetically, if there were factual issues in a one-on-one case that was coming from the PDTA, wouldn't there be a substantial evidence standard of review that would be applied to any of those factual questions? Every single one, Your Honor. There must be substantial evidence. I mean, that's, you know, reviewing claims as a whole. These are the Court's rules. Substantial evidence, that's part of 706 of the Administrative Procedure Act. And plus, just common sense. Just looking, if you just look at the exam, again, look at the examiner's rejection. Again, the appendix, 113 to 116, or 115. I mean, there's nothing in there, but it's a Dixit accusations, and it's a Dixit conclusory remarks. And it didn't even get to every limitation and didn't even discuss limitations as a whole. And you will find in the record that neither did the PTAB. PTAB never discussed the limitations as a whole. Not in Step 1, not in Step 2. That alone is enough to set this decision aside. And when it comes, of course, to me, I think, just as important issue on substantial evidence, I don't even know. As a patent prosecutor, I've been prosecuting patents now for 19 years. I don't even know how to respond to that. I don't even know an attorney who would know how to respond to this. This stops prosecution because how do you argue evidence when there's no evidence? How do you argue something, let's say a failure of an issue of law, if the PTAB will not even enforce the issues of law? That's why I'm here, Your Honor. The only thing I'm asking is for this court to bring some meaningful patent prosecution to 101. That's all. If I remember right, Judge Hughes, you yourself, last time I was here, about a year and a half, Irvine, actually, you asked the solicitor, is it possible for examiners to bring forth evidence on 101 cases to the extent evidence requirements cross over to 112, 102, and 103? And Mr. Kelly said, absolutely, Your Honor. And I actually agree with that. They're not going to be doing it by, let's say, citing various cases or, let's say, various patents because sometimes patents are never even brought into actual reduction of practice. But there's things like textbooks. There's things like dictionaries. There's a lot of things an examiner can look at to establish whether something's well-known, routine, and conventional or whether something's abstract. And in this case, if the examiners sit there and, let's say, even might have show little things like dictionary of real estate terms. If you go to, we have evidence showing that we had actual reduction of practice going back to 2003. And if you sit there and take a look at the relevant dictionary, you'll find that there's no recitation of AVM in it. You go to the 2013 version, yes, it does have AVM. But I don't understand the context in which you're arguing. I thought you acknowledged or just stole that. I'm sorry. There's no allegation here that AVM wasn't well-known and routine. Pardon? Is there an allegation? Was there a dispute whether or not AVM was well-known? Well-known, yes, there is a dispute. It's in the record, Your Honor. I say there's no evidence to prove it or no evidence to support it. I mean, there's zero or actually there's one thing, finally, on rehearing. So your contention is that the inventive concept or what makes it non-abstract, I don't know if we're arguing step one or step two, is AVM? No. I'm just saying that there's no evidence that even AVM is abstract, but we don't have to go there. If I want to talk about what the inventive, let's say the technical advantage in preprocessing and keeping a database of AVMs that's always current, certainly that's never been done. 102, 103, if you look at the board's decision, PTAB's decision, the original decision, they completely dismissed the examiner's assertions. So the inventive concept here is you don't think you need to go to AVM, so you're willing to concede that maybe that was conventional? It's not necessary to come to a correct decision here. So you're saying, what did you just say, that no one had ever done it as quickly or kept it up to date at all? No, ma'am. No, Your Honor. And that's the inventive concept. What I'm saying here is that if you take a look at the way even, and again, the board actually agreed with me and that AVMs and appraisals are not the same thing. They're not fungible, and there's evidence in the record to support that. But that said. This is the first time appraisals has even come into the conversation. I know that. It's not introduced. But I'm just saying, I want to make a metaphor here. But let's just say, for example, you have an appraiser, and appraisers wait for somebody to come up and ask them to do an appraisal. And then he does the appraisal. But let's just say that the same appraiser kept an appraisal, a current appraisal, which means he has to go about every three months for every house he's ever doing. And so he always has a current appraisal. Somebody comes up to him and says, I need an appraisal for this house. Now, for other reasons, it's impossible because he has to do inspections, including internal inspections. But he can give that person an appraisal within a minute. And in this case, an AVM, at least at the time when I first saw this technology, took about two seconds for an AVM. Instead of taking two seconds, we go down to microseconds. We can produce from seconds to microseconds to any individual. Why don't we look at the claim, or at least one of the claims? Why don't we look at 57? Is that a good representative of that's an independent claim? 57? Yes. I understand it's representative. Where are we talking about microseconds here? No, Your Honor, that's just absolutely inherent. How could you argue that? Look, there's two ways to do it. You can pre-process it and store it, or you can produce it at the time it's requested. And if it's produced at the time requested, you're going to take that processing time to perform it, rather than just take something out of a database, which is literally these days nothing more than microseconds. That's not contested. Okay, so you're using general-purpose computers here, and so the inventive concept here is doing this in a matter of microseconds? No, Your Honor, I'm saying that the inventive concept is creating and maintaining a database of AVM values that are always current, and they're pre-processed such that before anyone ever asks for it, it's available. It's the wearing clause that you're relying on, right? The wearing clause in Claim 57 where each AVM value is pre-processed such that an AVM value will be at least one residential property pre-accessed. Well, that's one of two. Actually, one of two. Hold on a second, Your Honor. Let's see, there's several also. Let's see, such that an AVM value for at least one residential property pre-exists before the user query of the respective property is performed. That's also inventive. And in this case, you even look at the 102 and 103. The PTAB found that no one had even ever bothered to create or maintain a database of AVM values. Even that had never been done before. Whether you want to call it obvious or anticipated, there's no evidence, and the PTAB acknowledged that. So I'm just trying to understand. So the inventive concept is we're not dealing with AVM. So everybody had the ability to get these AVM values, and anybody could go in and get an updated value. So the inventive concept is the maintenance of updated values.  But, again, even Mayo Alice doesn't require that. I don't remember anything specifically requiring an inventive concept. What's required is something beyond when you have, let's say you identify something that's abstract. And let's just assert, and, again, I say the only evidence that I think that the PTAB brought up on rehearing, they took one sentence out of context. It didn't address the specification as a whole, but let's even assume that AVMs are abstract and it's undeniable. In that, whether you have something more, and, again, sometimes they say something more. Sometimes the Supreme Court said something substantially more. It's a little confusing. I understand that. But it seems to me, especially in light of Berkheimer and Atrids, is that something more means that as an ordered combination has never been there before. Whether you want to call that inventive, yeah, I guess that would be inventive. But if you can say that something, the additional limitations as an ordered combination were not well-known, routine, and conventional, which is a higher standard. And what is it? Could you just, I mean, I know you've articulated before, but I'm just really missing the point. What is the something more that you've created here, keeping it up to date without a query? One of several. Recreate, and, again, if you have a database of AVMs, and, again, the whole map display is an example that's put in there, again, for example. And, again, let's say that you want to create a map, an online map, and you want to get an understanding of the distribution of housing values in a certain neighborhood. Let's say there's 1,000 houses. Now, if you want to do this, let's say, just an AVM online, two seconds per, it's going to take you 15 to 30 minutes to produce a map. You have those same values pre-processed, you can get all 1,000 AVMs out and into a consumer literally within milliseconds. Not minutes, not hours, milliseconds. That's a very distinct advantage, not even asserted that's ever been seen before. The distinct advantage being, I'm just trying to get this right. The distinct advantage being that you maintain an updated. The advantage is you can get an AVM value far quicker than with previous technology. That's one advantage. And the claim limitations go to that advantage. But even then. We're into your, we've exhausted your rebuttal. Why don't we get from the governor. Okay, thank you, Your Honor. May it please the Court. The board and the examiner here properly conducted the Alice-based 101 inquiry to conclude that these claims do not recite a patent-eligible invention. Under Step 1, the examiner and the board did exactly what Alice did, what Mayo did, what this Court has done since Alice. What, in your view, is required for the board to do in order to establish or conclude that this was nothing more than conventional, routine, and well-known? The Step 2 analysis. Correct. So under the Step 2 analysis, what must happen is the board, the examiner, the PTO, has to look at the claims, the claim limitations individually, collectively, and decide, what are we doing with the abstract idea? So here the abstract idea is some combination of the algorithm, which is unto itself abstract, and the algorithm is estimating the value of property, which is a fundamental economic practice. So when we look at Claim 57, the board and the examiner has to say, what are we using? How are we implementing the abstract idea? Are we just using generic computer components to execute it as a tool of the abstract idea? Or are we doing something else where the limitations individually or collectively are improving the computer technology? So, for example— Well, I think your friend, and I don't want to put words in his face, but I think what his instruction or his analysis would include the abstract idea. In other words, was it conventional to apply this generic computer to this idea and keep these values updated so that they're available immediately? Well, it can't be that something substantially more is the abstract idea. I mean, it has to be that the other components— In a computer-implemented invention, it has to be that the computer implementation is doing something other than just executing the abstract idea. So in this particular instance, if the purported advance is this reduction in latency, this reduction in the amount of time that it takes to provide a user when he or she asks for the estimated value to get it, we ask, how is the claim providing that benefit? And the how here is using computers to do what computers do. There's nothing in this claim that identifies anything other than generic computer equipment. His request for rehearing acknowledged that to be the case at Appendix 20. He's using generic computers to implement the abstract idea. Did you say Appendix page 20? 20. Thank you. Appendix page 743, which is the specification, at paragraphs 20 to 23 say you can use a personal computer, you can use a phone. I don't care. You can use whatever is out there. And the Board discussed this in its rehearing decision, in its rehearing decision at pages 3 to 6. The Board said at the bottom of 5, appellants concede that the claim dimension uses general-purpose computers. Request 10. The next sentence identifies paragraphs 20 and 21 of the specification, which I just pointed to, that a personal computer can be used at the terminal or the server. And there's nothing in this specification. What about if they use conventional computers to do something different that they've never used them to do before? Well, it's so that starts to get into the line between the 102-103 rejection and the 101. Thank you. I appreciate that. And the law has always recognized that either the absence of a 102 or 103 issue or even the decision that it hadn't been shown doesn't answer the 101 inquiry. The Supreme Court, as early as Deere categorically said, these are different concepts. 101 and 102 are not answering the same question. They reiterated that in Mayo when the Supreme Court rejected the government's position that, in fact, we should address these issues under 102 and 103, not 101. They're doing different lifting. And, again, it goes back to the question that we're answering isn't was this disclosed in a particular reference or would it have been obvious to one of our ordinary skill in the art. We're concerned more fundamentally with what is the claim doing and, at some level, for example, in Berkheimer, what in the specification has the applicant identified as its inventive concept? That fundamentally is what the Alice inquiry is about. It's about figuring out whether this is more than just the abstract idea on a generic computer but something more. So to contrast claims like in Versada and Alice, which are like the claims here, generic computer implementation of abstract ideas, you have EnFish. And EnFish is a great example. It was a claim to a database but not just a generic database. That was to a self-referential database that improved the functionality of the computer. We don't have an improvement to computer functionality here. What we have is computers doing what they do, run algorithms, store algorithms, update algorithms, display algorithms. That's what computers do. There's nothing in this claim. Your position, just to clarify, that this preprocessing is something that computers have done with other data, like in lookup tables and things like that. Well, as my friend said, you sort of have two choices. You can either run the algorithm before somebody asks or you can wait until they ask. Here he's built into his claim doing the former. I'm going to run it before they ask. And his position is that by using the computer to do what computers do before somebody asks, I reduce the time that it takes for me to provide that data to the user. I mean, leaving aside that none of these claims actually have a time component in terms of how, because the claims don't even require, there's no actual user request component in Claim 57, for example. This is just a system for distributing that comprises generating the AVM, storing the AVM, and then displaying it. But there's no actual user request component. Perhaps that's inherent. Well, this calls out that it says it's before there's a user inquiry. True, Your Honor. I guess the system contemplates that a user might request, but the system doesn't actually require that he or she do so. But you're right. The limitation is expressly incorporated there. But then we get back to the point, and the Board made this point in its initial decision. At appendix page 34, this is the third full paragraph at the bottom of that page, where they address Vienna's argument that the claims are not abstract and patent-eligible because the combination is unconventional and represents an improvement in technology by creating a faster process. But the Board agreed with the examiner, and this is the point we made in our brief that I'm making now. This is, quote, claims being performed on a general-purpose computer, and the appellants have not persuasively argued that the application of a mathematical algorithm to a general computer represents a technological improvement. If there is a reduction in latency, it's using computers to do what they do. And there are multiple decisions from this Court, including Versada, which say that simply using computers to do something faster or more efficient does not render your claim something substantially more under Step 2. So if there are no further questions, I'll yield. There are many on my side. Your Honor, I fully recognize that general-purpose computers, or the use thereof, have no impact one way or the other on the Alice-Mayo test. And indeed, under DDR, EnFish, McRow, Berkheimer, all those use computers. I'm not depending on a computer. I realize, you know, computers do very few things, actually. In reality, they're sequential instruction machines. However, it's what you do with those instructions, and it was acknowledged in EnFish that software improvements can be done through software. And that's exactly what I've done here. That's exactly what my client has done here. And I never argue. But EnFish improved the actual computer database. It didn't use a computer to run some kind of business method more efficiently. Well, it's, again, it's still a technical, whether you call this a business method or a technical improvement. Can you point to any case where we've decided that an abstract idea that performed on a computer is patent eligible, just because the computer makes it more efficient or faster or quicker, or even possible? There are some business methods that weren't possible. Your Honor, I've never made that argument. Never have I made that argument just because it's running on a computer. My argument comes to the preprocessing and maintaining the database of current AVM values. That's what I... It's still just storing, collecting, classifying information. But it's never been done. Well, Your Honor, it's still never been done before. To say that this is well-known, routine, conventional, and never been done before... You're skipping over the fact that that's the abstract idea. What is the abstract idea, Your Honor? Collecting, storing, classifying, displaying information. Have we ever held... DDR holdings. DDR holdings is nothing more than collecting, processing, and displaying. I guess almost with trading technologies. That was nothing more than rearranging and displaying data. And when it comes to even McRow v. Bandai, you're just sitting there taking data, processing data, and displaying it in the form of an animation. It happens all the time, Your Honor. And there's no reason... I don't think your claims are even remotely close to those cases. Your Honor? They're different. But you're saying that... But again, you talk about prejudicial. Ward sits there and cites trading technologies as being, let's say, more technologically advanced. That's just nonsense, Your Honor. That's just absolutely nonsense. And how do I sit there and argue facts made in a... How shall I say it? Assertions of fact made in a request-free hearing. How is this case different than Versado, than TLI, than any of these kinds of cases of classifying electronic data and the like, and using a computer to do it? Let's see. Well, one thing, there are... Under Step 2, we have a technical advantage. There is an undisputed technical advantage that has nothing to do with just because it's on a computer. Could you just articulate in one sentence to me what the technological advantage is? Being able to provide AVMs to a user faster. Can I ask you something? I mean, I understand what you're saying. One of the concerns I have with your case is being able to provide AVMs faster. I don't... I'm having a hard time seeing how your claim is directed to a new way of doing that. So, for example, if you had a different way of preprocessing, or if there's something in your specification that talked about this is a different way of preprocessing an algorithm. Okay. What the algorithm is. There's nothing like that in the specification. So it's a more generic description of preprocessing using a known algorithm. Well, Your Honor, here's the whole thing. Not all algorithms do the same thing. You're not going to sit there and compare one algorithm to another algorithm that do completely different things and just say that we're going to apply the same advantages or whatever. They have different advantages. AVMs do things completely different than the processing that occurred in McRowey Bandai. They used computers, but they didn't rely on computers. They used, as a matter of fact, the difference. The difference were these generic rules. They just had a first rule and a second rule. And that was it. One set of rules, second set of rules in what was well known to be processing for 3D animation. And what was this? They didn't even say what the rules were. They said, oh, there's some rules. The rules could be do nothing, multiply times one, add zero, something that does nothing. In that case, there was evidence that those rules were not conventional. It wasn't a conventional algorithm that was being used. Well, there was no evidence. I think if I remember correctly. But my question was directed to your specification because I hear what you're saying, but I don't know that distinguishing that case or talking about that case and telling you about how that didn't have any novelty or whatever. I don't think that helps you here. I think you should focus on your specification. Well, again, my specification talks about preprocessing of data. And it is inherent. I don't have to describe every advantage possible within the specification. But the point is, it's just as inherent. Just for example, if you're going to process data, you certainly need to collect data ahead of time. Some things you can assume are just going to be inherent. And other things you say, okay, if I have something preprocessed and I can store it away, by gosh, when I'm providing it to a user upon request, I don't have to process it. I can just take it from memory. I've saved that two seconds of processing. And, again, there's an amazing study done by Amazon who found that they lost 1% of business for every 100 milliseconds of delay online. That's why Amazon has the fastest systems out there. There's so little delay and they do that to keep business. So the whole concept of online delay is incredibly important when it comes to services online. I think we've exhausted our time. And thank you so much, Ron, and have a wonderful day.